IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Allaina Williams, ) | |
| ) | Civil Action No. 6:13-2907-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on February 15, 2011, alleging that she became unable to work on February 1, 2010. The applications were denied initially and on reconsideration by the Social Security Administration. On October 11, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and J. Adger Brown, Jr., an impartial vocational expert, appeared on June 15, 2012, considered

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

the case *de novo*, and on July 17, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 21, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> (2)     The claimant has not engaged in substantial gainful activity since February 1, 2010, the alleged onset date (20 C.F.R § 404.1571 *et seq*, and 416.971 *et seq.*).
>
> (3)     The claimant has the following severe combination of impairments: myasthenia gravis, diabetes mellitus, hypertension, obesity, and status post right eye cataract (20 C.F.R. § 404.1520(c) and 416.920(c)).
>
> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).
>
> (5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404,1567(a) and 416.967(a) requiring lifting, carrying and pushing, pulling ten pounds occasionally and five pounds frequently; sitting six hours and standing and/or walking two hours out of eight hours with normal breaks. The claimant can occasionally climb ramps and stairs, stoop, and kneel but never climb ladders/ropes/scaffolds or balance for safety (such as on dangerous or slippery surfaces). Due to her poor right eye vision, the claimant cannot perform assembly work with objects less than 1/4 inch in size, read fine print, or perform tasks requiring distance vision. She should not have exposure to work hazards (such as unprotected heights, dangerous moving machinery or dangerously sharp or cutting objects).

> (6)     The claimant is capable of performing past relevant work as a reservation clerk.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7)     The claimant was not been under a disability, as defined in the Social Security Act, from February 1, 2010, through the date of this decision  (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found

not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct

>       a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was born on March 2, 1977 (Tr. 59). She completed some college (Tr. 28). The plaintiff's past work history includes work as a security officer, reservation clerk, retail clerk, and waitress (Tr. 164). She alleges that she became disabled on February 1, 2010, due to blindness in one eye, diabetes, and myasthenia gravis (Tr. 163).

### *Medical Evidence*

On August 6, 2009, the plaintiff was seen at the Medical University of South Carolina ("MUSC") Health for uncontrolled myasthenia gravis (chronic autoimmune neuromuscular disease characterized by varying degrees of muscle weakness). She was admitted with weakness, shortness of breath, mild dysphagia, and double vision. She underwent plasmapheresis and was discharged the following day (Tr. 274). On August 17, 2009, the plaintiff was seen for an initial visit regarding her admission for myasthenia gravis, with which she was first diagnosed in 1996. She also had diabetes. The plaintiff had left lid weakness. Her motor exam, bulk, strength, and tone in bilateral upper extremities showed moderate deltoid weakness and minimal triceps weakness. The plaintiff had been taking Prednisone and Mestinon. CellCept was prescribed and eventual removal of the thymus was considered (Tr. 265-70).

On October 19, 2009, the plaintiff reported that she had difficulty obtaining the CellCept due to insurance problems. She continued to have double vision, lid weakness, occasional slurred speech, and weakness in her extremities. Her strength was 4/5. The plaintiff was very symptomatic while waiting for the CellCept to take effect (Tr. 264). On October 27, 2009, the plaintiff had weakness and tingling in her arms. She had eyelid weakness bilaterally, greater on the right, slurring speech, and increased double vision. She was given Prednisone (Tr. 242-43). On November 24, 2009, the plaintiff returned for a followup appointment regarding her myasthenia gravis. She reported significant headache in the past few months. She had left deltoid giveaway weakness secondary to pain. She was told to decrease the prednisone dosage so that thymectomy could be considered (Tr. 261-62).

On February 1, 2010, David E. Stickler, M.D., saw the plaintiff for her myasthenia gravis. After much confusion with the assistance program, the plaintiff was unable to stay on CellCept. As a result, she increased her prednisone and experienced slurred speech, double vision, and ptosis (drooping eyelid). She also reported some hand weakness. Dr. Stickler observed moderate ptosis on the right, moderate bilateral lid weakness, and reports of double vision with extraocular movement. The plaintiff had a good deal of give away weakness on the right upper extremity (Tr. 259-60).

On February 5, 2010, the plaintiff was admitted to MUSC Health for an acute crisis of myasthenia gravis. Her symptoms included coughing, shortness of breath, and difficulty swallowing. She endorsed generalized weakness and reported double vision. She received a plasma exchange and was discharged on February 12, 2010 (Tr. 227-34, 285-87).

On July 30, 2010, the plaintiff returned to Dr. Stickler with difficulty swallowing liquids, weakness, and double vision. She was taking 1000 mg of CellCept twice daily and had discontinued prednisone. She started having double vision early in July. She then had

intermittent leg weakness, finger weakness, and lid droop.  Her right eye had a severely disconjugate gaze and was virtually unable to track.  She had moderate right lid ptosis and moderate cheek puff weakness.  She could not rise from a seated position without using her hands (Tr. 252-53).

On August 3, 2011, the plaintiff called MUSC Health and reported throat tightness and jaw weakness.  She continued to take prednisone and Mestinon, but CellCept had caused diarrhea, so she quit taking it (Tr. 382).  On August 26, 2011, the plaintiff was seen in ophthalmology for vision loss in her right eye.  Cataract surgery was recommended (Tr. 348, 353).  On October 10, 2011, the plaintiff saw Dr. Stickler for generalized weakness and cranial weakness.  She reported diarrhea with CellCept.  Her right eye had a severely disconjugate gaze and was virtually unable to track.  She had moderate right lid ptosis and moderate cheek puff weakness.  Long term management included prednisone and intravenous immunoglobin ("IVIG") for exacerbations.  She was still having headaches (Tr. 380-81, 389).  On November 10, 2011, the plaintiff was seen for a followup for her myasthenia gravis.  She stated that the Mestinon helped her, but her eyes were watering and twitching.  She had moderate lid ptosis bilaterally.  She exhibited moderate bilateral deltoid weakness and weakness with head flexion.  The physician noted that weakness in the plaintiff's eyes might not be recoverable even with a high dose of prednisone (Tr. 378-79).

On February 13, 2011, the plaintiff was seen for diabetes.  She had previously continued her care with her primary care physician.  She did not tolerate Metformin because it caused diarrhea.  Lantus caused itching.  Her A1C was 11.8%.  She was unable to afford another insulin and would continue with Lantus.  Apidra was added (Tr. 373-76).  On December 29, 2011, Katherine Lewis, M.D., noted that the plaintiff called MUSC to say that she had stopped Lantus and Apidra due to low blood sugars.  She was only taking Glucovance (Tr. 372).  On February 28, 2012, the plaintiff reported intermittent double

vision and ptosis. She believed she was weaker on the right side than on the left with regards to her muscles. She had a headache. Her right eye was severely disconjugate and unable to track well. She had moderate bilateral lid ptosis. She was put back on CellCept (Tr. 415-16).

On March 20, 2012, the plaintiff was seen after her cataract surgery (Tr. 408). On April 12, 2012, the plaintiff reported no pain, but stated that she could not see small things. Her uncorrected right eye vision was 20/40 (Tr. 411, 413). On June 20, 2012, the plaintiff had a lot of weakness and fatigue. Her double vision was worsening. She continued to have diarrhea on CellCept 500 mg, but stated it was less than when she was on the 1000 mg dose. She had tightness in her throat, fatigue, ptosis, double vision, and tingling in the face. She had mild off and on weakness on the right side (Tr. 428).

On February 1, 2011, the plaintiff was seen for vision problems and eye pain at Lowcountry Eye Specialists (Tr. 302). On February 11, 2011, Jay Thompson, M.D., recommended cataract surgery for the right eye (Tr. 305). On February 21, 2011, the plaintiff still had eye pain, limited vision, headaches, and photophobia when outside (Tr. 309).

On March 7, 2011, the plaintiff was seen at Berkeley Medical Center for decreased vision due to cataracts. She reported diarrhea off and on for two years. Her diabetes was uncontrolled, and she needed to get on an assistance program for medications (Tr. 308). On August 10, 2011, Rose Delores Gibbs, M.D., saw the plaintiff again for diabetic treatment (Tr. 425). On June 7, 2012, the plaintiff was seen for a very painful right foot, tingling in arm and fingers, and a fluttering heart beat. She requested a handicap sticker and was ambulating with a cane (Tr. 423).

On April 25, 2011, the plaintiff was seen at Charleston Gastroenterology Specialists at the request of Dr. Gibbs for rectal bleeding and abdominal pain. She had intermittent abdominal cramps with diarrhea. She had a normal review of systems except

for myasthenia gravis, kidney stones, back pain, anxiety, prior blood transfusions, and frequent headaches. She had left lower quadrant tenderness in her abdomen (Tr. 320). On May 9, 2011, the plaintiff's colonoscopy was normal (Tr. 324).

On May 31, 2011, Temisan L. Etikerentse, M.D., at Hope Clinic, performed a consultative exam. The plaintiff had myasthenia gravis, was totally blind in her right eye, and had diabetes. She was unable to have cataract surgery due to lack of insurance. Her diabetes was not well controlled. Her last myasthenia gravis crisis had been months ago. She was on CellCept, prednisone, and Mestinon (Tr. 327-29).

*Physical Residual Functional Capacity Assessments*

On June 20, 2011, Hugh Wilson, M.D., determined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, walk, and sit about six hours in an eight-hour day. She should never climb ladders, ropes, or scaffolds. She could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She should avoid all exposure to hazards (Tr. 331-35). On September 16, 2011, Jean Smolka, M.D., opined the same exertional limitations as Dr. Wilson (Tr. 358-63).

*Hearing Testimony*

During the hearing, the plaintiff testified that she had not worked since February 1, 2010. She completed some college, but did not get a degree. She lived with her husband and her two children, aged seven and nine. She tried to do things for her children, and she had help from her niece every other day. Her children helped her do laundry. She tried to help them with school work, but her husband helped them most of the time. She did not leave the house to go to school functions (Tr. 28-30). The plaintiff stated that she was 5'8" tall, and she weighed 255 pounds. Her weight fluctuated due to medications, including CellCept and prednisone. She used a walking stick, prescribed by Dr. Gibbs one week prior to the hearing because her right leg and foot swelled when she was walking. She had sharp pain just walking from one room to another. The plaintiff

for myasthenia gravis, kidney stones, back pain, anxiety, prior blood transfusions, and frequent headaches. She had left lower quadrant tenderness in her abdomen (Tr. 320). On May 9, 2011, the plaintiff's colonoscopy was normal (Tr. 324).

On May 31, 2011, Temisan L. Etikerentse, M.D., at Hope Clinic, performed a consultative exam. The plaintiff had myasthenia gravis, was totally blind in her right eye, and had diabetes. She was unable to have cataract surgery due to lack of insurance. Her diabetes was not well controlled. Her last myasthenia gravis crisis had been months ago. She was on CellCept, prednisone, and Mestinon (Tr. 327-29).

*Physical Residual Functional Capacity Assessments*

On June 20, 2011, Hugh Wilson, M.D., determined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, walk, and sit about six hours in an eight-hour day. She should never climb ladders, ropes, or scaffolds. She could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She should avoid all exposure to hazards (Tr. 331-35). On September 16, 2011, Jean Smolka, M.D., opined the same exertional limitations as Dr. Wilson (Tr. 358-63).

*Hearing Testimony*

During the hearing, the plaintiff testified that she had not worked since February 1, 2010. She completed some college, but did not get a degree. She lived with her husband and her two children, aged seven and nine. She tried to do things for her children, and she had help from her niece every other day. Her children helped her do laundry. She tried to help them with school work, but her husband helped them most of the time. She did not leave the house to go to school functions (Tr. 28-30). The plaintiff stated that she was 5'8" tall, and she weighed 255 pounds. Her weight fluctuated due to medications, including CellCept and prednisone. She used a walking stick, prescribed by Dr. Gibbs one week prior to the hearing because her right leg and foot swelled when she was walking. She had sharp pain just walking from one room to another. The plaintiff

testified that she stopped working on February 1, 2010, because she had a medical crisis. She was in ICU, on life support and feeding tubes. After the crisis she did not reach a point where she could go back to work. Her muscles were still weak, and she had a lot of headaches (Tr. 30-31).

The plaintiff stated that she was hospitalized for seven days after her crisis. Upon release she was told she could not lift anything heavy, and her walking was limited. The plaintiff testified that she had been under a lot of stress, and she went in to the crisis. She was weakened and could not do anything. She did not have further hospitalizations, but she had other episodes of crisis. During those crises, she could not move for a couple of hours. She was weak, and she had double vision. She had to be carried to the bathroom. She experienced six crises in 2010 that did not require hospitalizations. She also stated that she did not go to the hospital because she did not have insurance. The plaintiff stated that she had eight more crises in 2011 (Tr. 32-34).

The plaintiff had very poor vision in her right eye. Eventually she had cataract surgery, and she still could not see small letters. She could read newspaper articles if she was wearing glasses (Tr. 35).

The plaintiff took CellCept for her myasthenia, but it did not seem to be working well. She had an appointment with her neurologist, who was talking about doing a thymectomy if the medication did not work. Dr. Stickler was the doctor who recommended that procedure. The plaintiff required weekly blood samples to check the white cell level and the level of medication in her systems. The plaintiff had recent changes in medications due to high blood pressure. Dr. Gibbs added Lystanton to the Lisinopril that she was already taking. The plaintiff also had problems with the insulin, and her doctor added another insulin to the three diabetic medications that she was taking. The medications caused diarrhea, weight loss, gum disease, and nausea. She was nauseated every time she took the medication, which was daily, for about an hour (Tr. 36-39).

The plaintiff also had shortness of breath caused by the myasthenia gravis every two weeks. She used an Albuterol inhaler twice a day to help her breathe. The smell of smoke also affected her breathing. The plaintiff stated that her condition worsened as she got older. She did not have much energy. The plaintiff had previously been found disabled for Social Security purposes. She was on disability from 1996 to 2000. When she got married, her benefits stopped. Her condition affected her some when she had children. She had to have C-sections due to her breathing problems. It was not uncommon for people with myasthenia gravis to have children, but it was not really recommended (Tr. 39-42).

The ALJ asked the plaintiff about her right eye. The plaintiff stated she had surgery on that eye in March 2012. She did not have good vision in that eye, and she could not see facial features of the ALJ. She was scheduled to return to her eye doctor in three months (Tr. 43).

The plaintiff's husband testified that his wife's condition was getting progressively worse. He helped with the household chores, including cooking and cleaning. There were times when he had to help her out of the bathroom because she did not have the strength to get up. The plaintiff's husband worked as a driver for the City of Isle of Palms from 7:30 a.m. to 3:30 p.m. His children tried to help, but they were only seven and nine. If there was something that they could not handle, they called him and he tried to get someone there to help them (Tr. 45-46). He testified that the plaintiff worked at one point, but she had to quit because she started falling down at work. The last time she was sick she had to be put on a ventilator for a week because she was too weak to breathe. He had witnessed her crises at home. The worst time was when she required hospitalization and had to be on a ventilator because she could not breathe on her own. While the children were at school, the plaintiff could not do much because she tired very quickly. When the

11

plaintiff's husband got home from work, he did the cleaning. After school, the children would do things like wash the dishes, and he did the rest of the chores (Tr. 46-47)

***Vocational Expert Testimony***

The vocational expert classified the plaintiff's past work as that of security guard patroller, *Dictionary of Occupational Titles* ("*DOT*") No. 372.667-038, semi-skilled, light; a waitress, *DOT* No. 311.477-030, semi-skilled, light; reservations clerk, *DOT* No. 238.362-014, skilled, sedentary; and retail sales clerk, *DOT* No. 290.477-014, semi-skilled, light (Tr. 48-49).

> The ALJ proposed the following hypothetical:
>
> Assume an individual of the claimant's age, education and past work experience who could lift and carry as well as push and pull 10 pounds occasionally and five pounds frequently. The individual could sit six hours and stand and/or walk a total of 2 hours in an 8-hour day with normal breaks. She could occasionally climb ramps and stairs, stoop, and kneel, but never climb ladders, ropes, or scaffolds, balance for safety on slippery or dangerous surfaces, and due to poor vision in the right eye could not do assembly work with objects less than about a quarter-inch in size. She should not read fine print or perform tasks requiring distance vision. She should not work around hazards such as unprotected heights, dangerous moving machinery, or dangerously sharp or cutting objects. The individual could not have concentrated exposure to respiratory irritants.

(Tr. 49-50). The vocational expert testified that the hypothetical individual could perform the work of reservation clerk, assuming that the vision was sufficient to be able to read normal sized print both written and on a computer monitor. The vocational expert also testified that an individual who used a cane for walking could perform the work of reservation clerk because it was a sedentary job. The vocational expert stated that cane use was not addressed in the *DOT*, but his answer was based on the fact that there would be very little walking involved in sedentary employment (Tr. 50). The vocational expert reported that an

individual that could not maintain attention and concentration for at least two hours at a time would not be able to the plaintiff's past work or any other work (Tr. 50-51).

The plaintiff's attorney asked the vocational expert if employment would be affected if the same hypothetical individual would need to take off one to two days per month. The vocational expert testified that one to two days per month would be allowed by most employers, but if the absenteeism reached three days a month on a sustained or consistent basis, the individual would not be able to work (Tr. 51-52).

### *Appeals Council Evidence*

The following opinions were submitted to the Appeals Council. On February 13, 2013, Dr. Stickler completed a physical residual functional capacity ("RFC") questionnaire for the plaintiff. He stated that he had treated the plaintiff since 2009 for myasthenia gravis. Her condition was chronic, and it could flare. It was treatable, but not curable. The plaintiff likely had permanent ocular impairment. Her symptoms included fatigue, ptosis, double vision, muscle weakness, and some dyspnea. Clinical findings included disconjugate gaze, limited extraocular movements, ptosis of the eye, eye closure weakness, and giveaway weakness. She had been treated with Cellcept, prednisone, and Mestinon. The CellCept could cause diarrhea, and the Mestinon could cause her eye to flutter. The plaintiff's impairments were likely to produce good and bad days (Tr. 434-37).

On July 1, 2013, Dr. Lewis completed a diabetes mellitus RFC questionnaire for the plaintiff. She stated that she initially saw the plaintiff in 2011, but the plaintiff had been treated in the clinic since 2008. The plaintiff was diagnosed with diabetes mellitus, uncontrolled. She had been a diabetic since 1997 (Tr. 327-28). She also had foot pain. Her symptoms included fatigue, extremity pain and numbness, episodes of vision blurriness, excessive thirst, hyper/hypoglycemic attacks, nausea, and vomiting. Her clinical findings included ptosis, obesity, foot edema, and tenderness. Dr. Lewis felt the plaintiff had frequent interference with attention and concentration due to her symptoms. Side

effects from medications included confusion, diaphoresis, tremors, fast heart rate, and, in severe cases, unconsciousness or seizures. The side effects were rare with proper management. Dr. Lewis opined that the plaintiff could walk one city block, sit more than two hours, and stand for twenty minutes at a time. The plaintiff could stand or walk for four hours and sit for six hours in a work day. The plaintiff would need to take breaks two to three times a day to check and correct her blood sugar levels. With prolonged sitting, the plaintiff's legs would need to be elevated one to two feet. If she had a sedentary job, her legs would need to be elevated 20 to 25% of the day if her legs were swollen. She could lift less than ten pounds frequently, ten pounds occasionally, twenty pounds rarely, and never lift fifty pounds. She could frequently twist and stoop, but never climb ladders. She could occasionally crouch and climb ramps or stairs. She should avoid all exposure to extreme cold and heat. She should avoid concentrated exposure to high humidity, fumes, odors, dusts, gases, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. The plaintiff's impairments would produce good and bad days, and on average the plaintiff would be absent from work about one day per month. The plaintiff's diabetes should not lead to additional functional impairments unless other illness causes acute worsening. Her foot pain and swelling was being evaluated further and may or may not be diabetes related (Tr. 439-44).

## ANALYSIS

The plaintiff was 32 years old on her alleged disability onset date (February 1, 2010), and she was 35 years old on the date of the ALJ's decision (July 17, 2012). The plaintiff argues that her case should be remanded for consideration of new opinion evidence from treating physician Dr. Lewis that was submitted to the Appeals Council. The plaintiff further argues that the ALJ failed to adequately explain the RFC findings with regard to her diabetes.

***Appeals Council***

The plaintiff first argues that the Appeals Council should have granted her request for review of the ALJ's decision based on new medical opinion evidence (pl. brief at 17-23). Specifically, the plaintiff submitted to the Appeals Council the medical opinion from Dr. Lewis set forth above. The opinion is dated July 1, 2013 – one year after the ALJ rendered her disability decision (Tr. 439-44). The Appeals Council denied the plaintiff's request for review, citing treatment records and a medical source statement dated May 15, 2013 (not the date of Dr. Lewis' statement), and stating, "The [ALJ] decided your case through July 17, 2012. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before July 17, 2012" (Tr. 2). Dr. Lewis' opinion, along with the other evidence submitted to the Appeals Council, was made part of the record (Tr. 5).

The Appeals Council must consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the date of the ALJ's decision. *See Wilkins v. Secretary of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991); *see also* Social Security Administration, Office of Hearings Appeals, Litigation Law Manual ("HALLEX") I-3-3-6 (Dec. 27, 2012), *available at* http://www.ssa.gov/OP_Home/hallex/I-03/I-3-3-6.html.

There is no indication by Dr. Lewis that her assessment of the plaintiff's functioning pertains to the period on or before the date of the ALJ's decision; rather it appears to be a current assessment of the plaintiff's condition in July 2013, nearly a year after the ALJ's July 17, 2012, decision (Tr. 439-44). The plaintiff argues, however, that Dr. Lewis' opinion relates back to the period before the ALJ's decision because her diabetes is a long-standing condition that was present before the ALJ's decision (pl. brief at 19-20). However, as argued by the Commissioner, even if this court was to find that Dr. Lewis' opinion does relate back to the relevant period in this case, the opinion still does not

"impugn the integrity of the ALJ's decision." *See Meyer v. Colvin*, 754 F.3d 251, 257 (4th Cir. 2014) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (defining "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion")). In other words, this new information was not significant enough to require reversal of the Commissioner's decision because, despite this new evidence, substantial evidence still supports the ALJ's decision.

The plaintiff argues that Dr. Lewis' opinion supports a disability finding because: 1) it requires "unscheduled" breaks; 2) suggests that her symptoms would frequently interfere with her attention and concentration; and 3) that needing to elevate one's legs when they are swollen would be incompatible with sedentary work (pl. brief at 20-21). However, the undersigned finds that the ALJ's RFC restrictions are consistent with (and in some cases, more restrictive than) the limitations found in Dr. Lewis' opinion.

First, as noted by the Commissioner, the question posed in the questionnaire regarding breaks did not present a choice as to whether the plaintiff's need for breaks to monitor her blood sugar would be "unscheduled" as opposed to normally scheduled breaks (Tr. 441). The question asked, "Will your patient sometimes need to take unscheduled breaks during an 8-hour working day?" and "How often do you think this will happen?" (*id.*). The doctor responded that the plaintiff would need to take breaks two-to-three times a day to check and correct her blood sugar levels, but also wrote that the plaintiff's "diabetes, if given short breaks to manage it properly, should not lead to additional functional impairments unless other illness causes acute worsening" (Tr. 441, 444). There is no notation in Dr. Lewis' treatment notes that the plaintiff would require "unscheduled" breaks. Moreover, the plaintiff has reportedly been diabetic since 1997, but she did not stop working until February 2010 (Tr. 327-28). Since the plaintiff has not alleged a worsening of her diabetic condition since its onset, presumably the condition (and need to check and correct blood sugar levels during breaks) did not preclude work.

Next, with respect to concentration and attention, Dr. Lewis indicated in the questionnaire that the plaintiff's experience of diabetic symptoms would "frequently" interfere with her concentration and attention; however, the doctor did not describe the nature of that interference (Tr. 440). Moreover, the record does not support a limitation in this area. During a face-to-face interview with a Social Security Administration ("SSA") representative, the plaintiff was observed to have no difficulty in concentrating or understanding questions (Tr. 160). Additionally, in describing her limitations to SSA, the plaintiff denied that she had any trouble concentrating, understanding, following instructions, remembering, or completing tasks (Tr. 186). The plaintiff explained that she finishes what she starts and follows both written and spoken instructions "well" (*id.*). A neurological examination performed on August 17, 2009, reflects that the plaintiff's attention was "normal" (Tr. 270). Further, as pointed out by the Commissioner, Dr. Lewis also indicated that the plaintiff would be capable of tolerating a "moderate" degree of stress in the workplace – an opinion that is inconsistent with a belief that the plaintiff was unable to maintain an acceptable degree of concentration and attention due to her conditions alone (*see* Tr. 440).

With respect to the plaintiff's need to elevate her legs while working, if they were swollen (*see* Tr. 442), the plaintiff has not explained why this would be inconsistent with a sedentary job, such as the reservation clerk position she performed in the past. Furthermore, the plaintiff testified that she stopped working because of a medical crisis, which was related to myasthenia gravis, and did not return to work because her muscles were weak and she experienced a lot of headaches (Tr. 31; *see* Tr. 227-34, 285-87). She has not, however, alleged a worsening of her diabetic condition. As noted above, since the plaintiff reported that she has been diabetic since 1997 and only stopped working in 2010, her condition (and the occasional need to elevate her legs to reduce swelling), did not preclude her from performing past jobs.

17

Based upon the foregoing, even if Dr. Lewis' opinion related to the pertinent period, the undersigned finds that substantial evidence still supports the ALJ's decision, and this allegation of error is without merit.

***Residual Functional Capacity***

The plaintiff next argues that the ALJ erred by failing to properly consider certain limitations related to her diabetes in the RFC assessment (pl. brief at 24-25). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The plaintiff argues that the ALJ should have included the following limitations in the RFC assessment: 1) a need for unscheduled breaks to monitor and adjust blood sugar levels; 2) a need for unscheduled breaks due to diarrhea; 3) more specific

restrictions relating to her visual impairment; and 4) limitations relating to attention and concentration (pl. brief at 24-25).

As discussed above, the plaintiff has not alleged a worsening of her diabetic condition, which has been longstanding since 1997 (Tr. 327), and she has been able to perform numerous jobs with this condition (and its attendant limitations) – e.g., waitress (2008-2010), assistant store manager (2007-2008), store supervisor (2005-2007), store cashier (2004-2005), vacation rental agent (2003-2004), hotel reservation agent (2001-2003), and security guard (2000-2001). With regard to Dr. Lewis' opinion that the plaintiff would require breaks to monitor and correct her blood sugar levels, it is not clear that such breaks would need to be "unscheduled" (*see* Tr. 441). Regarding the plaintiff's alleged need for unscheduled breaks due to diarrhea, she has presented no evidence that she would require additional, unscheduled bathroom breaks (beyond what would ordinarily be permitted in a workplace). Treatment notes show that the plaintiff complained that her medication caused diarrhea (Tr. 373, 380-82). As noted by the ALJ (Tr. 18), in April 2011, a gastroenterologist noted that the plaintiff had "intermittent abdominal cramps with diarrhea," which the physician thought could be treatable with medication (Tr. 319-20). In June 2012, the dosage of CellCept was decreased, which the plaintiff felt helped (Tr. 428).

As for limitations relating to attention and concentration, again, only Dr. Lewis included this limitation in her opinion, and she did not specify the degree of limitation involved (*see* Tr. 440). A neurological examination performed on August 17, 2009, reflects that the plaintiff's attention was "normal" (Tr. 270). Moreover, even the plaintiff reported that she had no limitations in attention and concentration (Tr. 160, 186).

Lastly, the plaintiff argues that the ALJ's visual limitation "seems arbitrary" (pl. brief at 25). Based on poor right eye vision, the ALJ found that the plaintiff "cannot perform assembly work with objects less than 1/4 inch in size, read fine print[,] or perform tasks requiring distance vision" (Tr. 16). The ALJ specifically noted (Tr. 18) that while the plaintiff

19

was found to have no vision in her right eye upon consultative examination in May 2011 due to a cataract (Tr. 327-29), the cataract was removed in March 2012, and the uncorrected visual acuity was thereafter listed as 20/40 in the right eye and 20/20 in the left eye (Tr. 413). Additionally, Dr. Lewis did not include any visual restrictions in her 2013 opinion (Tr. 439-44). In making the RFC finding, the ALJ took into account the plaintiff's prior history of right eye cataract as well as her complaint that she could not "see small things" (Tr. 411) and had blurred vision (Tr. 34-35) even after the cataract surgery (Tr. 18-19). The plaintiff has not demonstrated (nor even alleged) that any other particular limitations are required to address her visual impairment.

Based upon the foregoing, the undersigned finds that the ALJ's RFC assessment is based upon substantial evidence and is without legal error.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald  
United States Magistrate Judge

December 31, 2014  
Greenville, South Carolina